**Kyle Walker WRIGHT, Appellant,**

v.

**The STATE of Texas.**

**No. 297–98.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 15, 1999.

David Reynolds, Austin, for appellant.

David Glickler, Asst. Dist. Atty., Georgetown, Matthew Paul, State's Atty., Austin, for State.

## *OPINION*

MANSFIELD, J., delivered the opinion of the Court which was joined by McCORMICK, P.J., and KELLER, HOLLAND, WOMACK and KEASLER, JJ.

Kyle Walker Wright, appellant, was a passenger in the rear seat of a car traveling east on Highway 620 in Williamson County at about 4:00 AM on April 28, 1996. Appellant was observed by William-

son County Deputy Sheriff Jack Tomlinson leaning out of an open rear window and vomiting.[1] Deputy Tomlinson testified at a suppression hearing he thought it was unusual for a passenger to be hanging out of the window of a moving car while vomiting; he therefore stopped the car "basically to make sure he was not being assaulted and to see if he needed medical attention." Deputy Tomlinson also testified he was concerned appellant was at risk if the car had a blow-out or somehow went out of control. It is undisputed no criminal activity or traffic law violation was observed by the deputy prior to his stopping the car.

As he approached the car, Deputy Tomlinson testified, he smelled odors suggestive of alcoholic beverages and marihuana. He then observed a partially smoked marihuana cigarette in plain view on the console between the two front seats. No other controlled substances were found in the vehicle. Appellant was subsequently charged with the offense of possession of less than two ounces of marihuana. Tex. Health and Safety Code § 431.121(b)(1). Pursuant to a plea bargain after his motion to suppress was denied, appellant entered a plea of no contest. The trial court deferred adjudication of guilt, assessed a fine of $250, placed appellant on community supervision for nine months, and ordered him to perform fifty hours of community service.

The Third Court of Appeals sustained appellant's sole point of error and reversed, holding the marihuana was observed as the fruit of an illegal stop and must be suppressed as such. *Wright v. State*, 959 S.W.2d 355 (Tex.App.-Austin 1998).

We granted the State's Petition for Discretionary Review to consider the following ground for review:

> Where an officer has reasonable grounds to believe that a passenger in a moving vehicle is in need of assistance,

or is in danger of being harmed, does the Fourth Amendment prohibit the officer from conducting an investigatory stop pursuant to the officer's "community caretaking" function?

■ The United States Constitution protects persons against "unreasonable searches and seizures." U.S. Constitution amend. IV. In general, law enforcement personnel may not search or seize an individual absent a warrant based on probable cause. However, a temporary investigative detention and pat down search for possible weapons or contraband without a warrant is permissible provided the officer has a reasonable belief the individual has been engaged in criminal activity or is armed. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). See also *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

The Supreme Court, furthermore, has, for several decades, recognized that automobiles, due to their mobility, present a situation different than that of fixed property, such as a residence. Accordingly, the Court has recognized an automobile exception to the general requirement under the Fourth Amendment that a warrant first be obtained before a search or seizure may be conducted. Under certain recognized circumstances, warrantless searches and/or seizures of automobiles and the persons found therein may be reasonable, even though a warrant might be required for a search of a fixed piece of property such as a residence. *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967); *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54

---

1. Besides appellant, there were two other persons in the vehicle, the driver and a second passenger.

L.Ed.2d 331 (1977); *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

■ In the present case, the vehicle in which appellant was a passenger was not stopped due to any violation of traffic laws or because it was suspected of having been involved in any criminal activity. Therefore, the automobile exception to the warrant requirement set forth in the above cases is not applicable here.

However, the Supreme Court has also recognized a community caretaking function of law enforcement as a reasonable exception to the Fourth Amendment's warrant requirement. In *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), the accused was involved as the driver in an accident.[2] His disabled vehicle was towed to a private lot. Because the accused was a police officer in another city (Chicago), the arresting officer searched the vehicle after it was towed for the accused's service revolver. Evidence tying the accused to a murder committed shortly before his accident was found in the trunk of the accused's car. No service revolver was found. The accused was subsequently convicted of the murder.

In upholding the warrantless search of Dombrowski's vehicle, the Court held:

> In *Harris,*[3] the justification for the initial intrusion into the vehicle was to safeguard the owner's property, and in *Cooper,*[4] it was to guarantee the safety of the custodians. Here, the justification, while different, was as immediate and as constitutionally reasonable as those in *Harris* and *Cooper:* concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle ... although there is no record basis for discrediting such testimony, it was corroborated by the circumstantial

fact that at the time the search was conducted Officer Weiss was ignorant of the fact that a murder, or any other crime, had been committed ... the fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, by itself, render the search unreasonable.

*Cady v. Dombrowski,* 93 S.Ct. at 2531.

■ The search at issue in *Cady v. Dombrowski* was not conducted to uncover evidence of criminal activity; it was conducted solely to locate and secure Dombroski's service revolver out of concern that it might fall into the hands of the wrong people. Similarly, in the present case, the car in which appellant was a passenger was stopped, not because of any evidence of criminal activity, but out of concern for appellant's health. Thus, we must determine if Deputy Tomlinson acted reasonably when he stopped the vehicle out of concern for the welfare of appellant when he observed him leaning out the open rear window and vomiting at 4:00 AM.

■ The Supreme Court expressly recognized that police officers do much more than enforce the law, conduct investigations, and gather evidence to be used in criminal proceedings. Part of their job is to investigate accidents—where there is often no claim of criminal liability—to direct traffic and to perform other duties that can be best described as "community caretaking functions." *Cady v. Dombrowski,* 93 S.Ct., at 2528. As part of his duty to "serve and protect," a police officer may stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help. In determining whether a police officer acted reasonably in stopping an individual to determine if he needs assis-

---

**2.** The accused was intoxicated and was subsequently arrested for driving while intoxicated and brought to a hospital for treatment of his injuries.

**3.** *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

**4.** *Cooper v. California, supra.*

tance, the following factors[5] are relevant to said determination:

(1) the nature and level of the distress exhibited by the individual;

(2) the location of the individual;

(3) whether or not the individual was alone and/or had access to assistance independent of that offered by the officer; and

(4) to what extent the individual—if not assisted—presented a danger to himself or others.

Appellant avers that different standards should apply, i.e., stricter standards, to stops under the community caretaking doctrine of a vehicle to check on the welfare of a passenger as opposed to that of the driver. It is true that a driver in distress is potentially a greater threat to the well-being of the general public than that presented by a distressed passenger. The Supreme Court, in *Cady*, however, drew no distinction in the applicability of the community caretaking function to stops to determine the welfare of passengers as opposed to drivers and we refuse to do so here.[6]

■ While we today recognize the existence of the community caretaking function in Texas, we emphasize its narrow applicability. Only in the most unusual circumstances will warrantless searches of private, fixed property, or stops of persons located thereon, be justified under the community caretaking function, given the greater expectation of privacy inherent with respect to residences and other private real property.[7]

The judgment of the court of appeals is vacated and this cause is remanded to the court of appeals for further proceedings consistent with this opinion.

MEYERS, J. delivered a dissenting opinion.

JOHNSON, J., delivered a dissenting opinion which was joined by PRICE, J.

MEYERS, J. delivered a dissenting opinion.

The Court vacates the judgment of the appellate court and remands this case for additional proceedings consistent with its opinion. *Ante*, at 152. Specifically, the majority directs the Court of Appeals to determine on remand whether Deputy Tomlinson acted reasonably when he stopped the car in which appellant was a passenger in order to check on appellant's welfare. *Id.* at 151. But the issue of whether Deputy Tomlinson acted reasonably has already been decided by the lower court.[1] The appellate court expressly concluded that, even under a "community caretaking"-type analysis, the officer's actions in these circumstances were *un*reasonable. *See Wright v. State*, 959 S.W.2d 355, 358 (Tex. App.—Austin 1998) ("We note ... that appellant's detention would not have been lawful even under the *Cady* 'community caretaking' doctrine.... The stopping and detention of appellant was simply an unreasonable exercise of authority by [Deputy Tomlinson] in violation of appellant's constitutional rights"). That issue is therefore squarely before this Court and deserves to be addressed. *See, e.g., Lee v. State*, 791 S.W.2d 141, 142 (Tex.Crim.App. 1990) (per curiam) (noting that, as a court of discretionary review, we are authorized to review "decisions" of the courts of ap-

---

5. In certain instances, other factors may also be relevant in determining whether the officer acted reasonably.

6. We note that there were no passengers in Dombrowski's vehicle when stopped by the police.

7. We have already recognized a doctrine similar to the community caretaking function applicable to warrantless searches of private residences: the emergency doctrine. See *Brimage v. State*, 918 S.W.2d 466, 500–502 (Tex. Crim.App.1996) (plurality op.).

1. The State acknowledges this point in its brief and properly asks this Court to review the reasonableness issue on the merits. *See* State's Brief in Support of Petition for Discretionary Review at 8.

peals); *see also*, TEX.CRIM. PROC.CODE ANN. art. 44.45(b) (Vernon 1979 & Supp.1999); TEX.R.APP. P. 66.1. Furthermore, while I agree that there are circumstances where law enforcement may constitutionally stop a vehicle absent any suspicion of criminal wrongdoing, I disagree with the manner in which the majority formulates its "totality of the circumstances" test without any reference to established Fourth Amendment case law. I dissent.

Proper appellate analysis begins with the standard of review. In *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex.Crim. App.1997), this Court indicated that it would give "almost total deference to the trial court's determination of historical facts" and that it would review *de novo* "mixed questions of law and fact" that did not turn on an evaluation of credibility and demeanor. In the instant case, the "historical facts" are uncontroverted. *See ante,* at 149 – 150. Under the rubric presented in *Guzman,* the "mixed question" involving whether Deputy Tomlinson's actions were reasonable under the Fourth Amendment must be reviewed by this Court *de novo.* *Guzman,* 955 S.W.2d at 89.

Neither this Court nor the United States Supreme Court has had occasion to decide whether the Fourth Amendment authorizes officers to make "welfare" stops of law-abiding citizens.[2] However, many courts in other jurisdictions have addressed the issue, and, as far as my research has revealed, all of those have at least suggested that a stop may be authorized in the absence of reasonable suspicion or probable cause in circumstances where an officer is reasonably carrying out his role as "community caretaker." *See generally United States v. Rideau,* 949 F.2d 718, 720 (5th Cir.1992), *vacated on other grounds,* 969 F.2d 1572 (5th Cir. 1992) (en banc) (agreeing with panel on this point); *United States v. King,* 990 F.2d 1552, 1559–60 (10th Cir.1993); *United States v. Dunbar,* 470 F.Supp. 704, 706–07 (D.Conn.1979), *aff'd,* 610 F.2d 807 (2d Cir. 1979); *Crauthers v. State,* 727 P.2d 9, 10–11 (Alaska Ct.App.1986); *State v. Harrison,* 111 Ariz. 508, 533 P.2d 1143, 1144 (1975); *In re Clayton,* 113 Idaho 817, 748 P.2d 401, 402–03 (1988); *State v. Mitchell,* 498 N.W.2d 691, 693–94 (Iowa 1993); *State*

**2.** The majority seems to conclude that *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), is, by itself, dispositive of this issue. Specifically, the majority makes the broad assertion that in *Cady,* "the Supreme Court ... recognized a community caretaking function of law enforcement as a reasonable exception to the Fourth Amendment's warrant requirement." *Ante,* at 151. *Cady,* however, dealt only with the search of an impounded vehicle for a weapon after police had otherwise validly seized the vehicle itself. *See Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (citing *Cady* community caretaking doctrine as referring "to police caretaking procedures designed to secure and protect vehicles and their contents within police custody"); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (describing *Cady* community caretaking function as taking vehicles into custody that might "jeopardize public safety and the efficient movement of vehicular traffic"); *see also Barrett v. Commonwealth,* 18 Va.App. 773, 447 S.E.2d 243,

247 (1994) (Elder, J., dissenting) (noting distinction between facts of *Cady* and those of an public assistance stop). The instant case, on the other hand, presents us with a *stop* of a moving vehicle for the purpose of ensuring the welfare of one of the vehicle's passengers. A "search" of a validly impounded vehicle and a "seizure" of a moving vehicle which is not associated with any criminal activity are clearly two different things. The Court of Appeals appeared to recognize this distinction and declined to extend the holding of *Cady* without guidance from this Court. *See Wright,* 959 S.W.2d at 358 (citing *Rheinlander v. State,* 888 S.W.2d 917, 918–19 (Tex.App.— Austin 1994), *pet. dism'd, permanently abated,* 918 S.W.2d 527, 528 (Tex.Crim.App.1996)). Like the majority, I ultimately conclude that an officer may lawfully stop a vehicle in her capacity as a "community caretaker" under the proper set of circumstances. *See infra,* at 152. Unlike the majority, however, I conclude that *Cady* is only part of a complete legal analysis, and is not by itself the answer to the question presented.

*v. Vistuba*, 251 Kan. 821, 840 P.2d 511, 514 (1992), *overrulled on other grounds, State v. Field*, 252 Kan. 657, 847 P.2d 1280, 1286 (1993); *Commonwealth v. Smigliano*, 427 Mass. 490, 694 N.E.2d 341, 348 (1998); *State v. Pinkham*, 565 A.2d 318, 319–20 (Me.1989); *State v. Parker*, 127 N.H. 525, 503 A.2d 809, 811–13 (1985); *State v. Cryan*, 320 N.J.Super. 325, 727 A.2d 93, 95–7 (App.Div.1999); *State v. Martinez*, 260 N.J.Super. 75, 615 A.2d 279, 281 (App. Div.1992); *Apodaca v. State Taxation & Revenue Dept.*, 118 N.M. 624, 884 P.2d 515, 516–17 (App.1994); *State v. Reynolds*, 117 N.M. 23, 868 P.2d 668, 670–71 (App. 1993); *Provo City v. Warden*, 844 P.2d 360, 362–65 (Utah Ct.App.1992), *aff'd*, 875 P.2d 557 (Utah 1994); *State v. Marcello*, 157 Vt. 657, 599 A.2d 357, 358 (1991); *Barrett v. Commonwealth*, 18 Va.App. 773, 447 S.E.2d 243, 245–46 (1994) (upon reh'g, en banc); *State v. Chisholm*, 39 Wash.App. 864, 696 P.2d 41, 42–3 (1985). These decisions are based on the idea that police officers serve many roles that are not directly related to criminal law enforcement. *See, e.g., Dunbar*, 470 F.Supp. at 707 ("It would be too extravagant to contend that a benign purpose of rendering assistance could never justify the stop of a motorist").

The Court of Appeals suggested that under legal authority from this Court, an officer cannot detain an individual unless he suspects him of some type of criminal activity. I agree with the majority that we should not read our precedent so narrowly. An officer's responsibilities in his role as community caretaker are not limited to those duties involving the investigation of crimes. In this vein, the Legislature has used broad language to define the "duties" of Texas peace officers. *See* TEX.CRIM. PROC.CODE ANN. art. 2.13 (Vernon 1977) ("It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means"). Based on this language, it seems reasonable to conclude that Texas peace officers are charged with public safety duties that extend beyond crime detection and investigation:

> The policeman, as a jack-of-all-emergencies, has "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses"; by default or design he is also expected to "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," and "provide other services on an emergency basis."

3 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 5.4(c) (3d ed.1996) (quoting ABA Standards for Criminal Justice §§ 1–1.1(b), 1–2.2 (2d ed.1980)).

The majority is correct to point out that the Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), acknowledged and welcomed this additional role for local police officers. There, the Court wrote:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 441, 93 S.Ct. at 2528; *see also Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968) ("Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to the desire to prosecute for crime"). This rationale, which supported

the search of an impounded vehicle in *Cady* for a missing pistol, also supports an officer's legitimate role as a public servant with a duty to assist those in distress and maintain and foster public safety on Texas' roads and highways. Neither *Terry* nor any of this Court's opinions interpreting the Fourth Amendment exclude the possibility that an officer may stop an individual traveling on a public highway for reasons which do not involve suspicion of criminal activity.[3]

Nevertheless, just because an officer has no suspicion of criminal activity when he effectuates such a stop does not mean that the Fourth Amendment is not implicated. "It is surely anomalous to say that the individual ... is fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court*, 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967) (footnote omitted); *see also Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth and Fourteenth Amendments, even though the purpose of the stop is limited and the resulting detention is quite brief") (citations omitted). Thus, a "welfare" or "safety" stop, which qualifies as a "seizure" within the meaning of the Fourth Amendment, must not offend the constitutional proscription against unreasonable searches and seizures.

Whether or not a given stop is reasonable "depends on a balance between the public interest and the individual's right to personal security free from arbitrary in-

terference by law officers." *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975) (citations omitted); *see also Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396 ("[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests") (footnote omitted).[4] In measuring the weight of the public interest, the first step involves an inquiry into whether the officer was performing a bona fide community caretaking or public safety function. *See Warden*, 844 P.2d at 364. In other words, a court should examine whether the purpose expressed by the officer for the stop is consistent with his legitimate role as community caretaker. Furthermore, the officer's proffered justification must be supported by "specific and articulable facts." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880.

Once a legitimate public interest has been identified to justify the stop, and that interest is supported by objective facts and circumstances, it must be balanced against the resulting interference with an individual's liberty. The liberty interest implicated in a so-called "welfare stop" is similar to that implicated by the random stops condemned by the Supreme Court in *Prouse*. "Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may cre-

---

3. I am troubled by the dicta in the majority's opinion suggesting that a community caretaking exception might also be applicable in circumstances involving "private, fixed property, or stops of persons located thereon." *See ante*, at 151 – 152. We are not called upon in this case to decide whether police officers are authorized to enter real property on less than emergency circumstances. *See Brimage v. State*, 918 S.W.2d 466, 500–02 (Tex.Crim.App. 1996) (plurality op.).

4. The majority fails to recognize that the Fourth Amendment mandates this form of balancing test. *See ante*, at 152. Instead, the majority simply states, without any citation to authority, that "a police officer may stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help." *Id.*

ate substantial anxiety." *Prouse*, 440 U.S. at 657, 99 S.Ct. at 1398.

The difficult question, then, is one the majority declines to answer—that is, whether the stop in the instant case was reasonable in light of all the facts and circumstances and in light of the interests of both the State and the appellant. Aiding a citizen who is in need of medical attention is a valid public interest.[5] However, this case presents facts which, taken as a whole, do not support a reasonable belief that appellant was in need of such immediate aid. The only sign of distress shown by appellant was that he vomited. That minimal level of distress is further offset by other facts presented in the record. For instance, appellant was a passenger in a vehicle being driven safely and lawfully and which carried two other occupants apparently able to render assistance. Furthermore, there is no indication in the record that any of the vehicle's occupants were seeking assistance—they neither made any gesture that could be interpreted by Officer Tomlinson as requesting help nor were they driving in a manner that might suggest an emergency.

In these circumstances appellant's privacy interests under the Fourth Amendment outweigh the State's interest in rendering aid. Although the "judicial scales are not well calibrated to compare the slight governmental and privacy interests on either side of the balance in this case," that balance should be struck in favor of privacy for at least two reasons. *Dunbar*, 470 F.Supp. at 708. First, "[t]he policy of the Fourth Amendment is to minimize governmental confrontations with the individual."

*Id.* That policy is hindered by allowing police officers to stop vehicles, absent any suspicion of criminal activity, simply because a passenger was observed throwing up. Second, *the risk of subterfuge on these facts is real. Id.* However well-intentioned Deputy Tomlinson was in this case, the exception should be reserved for circumstances where police intervention is clearly necessary.

Deputy Tomlinson's actions were unreasonable under the standards mandated by the Fourth Amendment. I would affirm the judgment of the Court of Appeals. I dissent.

JOHNSON J., delivered a dissenting opinion in which PRICE, J. joined.

I respectfully dissent to the majority's decision to remand this cause to the court of appeals. Additionally, I write separately to express my reservations over the majority's interpretation and extension of the *Cady*[1] community-caretaking function.

I note initially that this Court has not adopted a community-caretaking function under Article I, Section 9 of the Texas Constitution.[2] Because the state's petition seeks review only under federal constitutional grounds, it is unnecessary to consider the community-caretaking function as it may apply to the Texas Constitution.

The federal Constitution "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, this Court is bound, as is any state court, to adhere to

---

5. Deputy Tomlinson offered another explanation for the stop—that the car "could have had a blow out, lost control. [Appellant] could have been smashed into a pole or something like that. The car could have gone off into a ditch, rolled over on top of him, broke his back." In light of the facts of this case this justification is far too speculative to outweigh appellant's privacy interests.

1. *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

2. This issue was recently presented in *Hulit v. State*, 982 S.W.2d 431 (Tex.Crim.App.1998). We found from the totality of the circumstances in *Hulit* that Article 1, Section 9 of the Texas Constitution had not been violated, but did not rule on the issue of whether there is a community-caretaking exception to the warrant requirement. *Hulit*, 982 S.W.2d at 438.

and follow the decisions of the Supreme Court to the extent that they set the minimum constitutional standards concerning the Bill of Rights of the federal Constitution, which are applicable to the states through the Fourteenth Amendment. *Andrews v. State*, 652 S.W.2d 370, 382–83 (Tex.Crim.App.1983). Accordingly, we are bound by the decision in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), where the U.S. Supreme Court recognized a community-caretaking exception to the warrant requirement of the Fourth Amendment:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Id.* at 441, 93 S.Ct. at 2528. I believe, therefore, that a community-caretaking doctrine exists in Texas, but it is the federal doctrine as defined in *Cady*.

The court of appeals refused to adopt a community-caretaking doctrine without direction from this Court. *Wright*, 959 S.W.2d 355, 358 (Tex.App.—Austin, pet.granted). The court of appeals also found that, even if it recognized the *Cady* doctrine, the stop in the instant case was not lawful. *Id.* Appellant was a passenger, not the driver of the vehicle, and therefore his detention was not lawful under the *Cady* community-caretaking doctrine. *Id.*

Because the court of appeals correctly decided that issue, a remand to that court, as ordered by the majority, is not necessary.

The majority correctly notes that the search at issue in *Cady* was not conducted to uncover evidence of criminal activity. *Ante,* at 151. The warrantless search was conducted to protect the general public. *See Cady,* 413 U.S. at 443, 93 S.Ct. at 2529. The Supreme Court concluded that because the trunk of the automobile, which the officer reasonably believed contained the driver's service revolver, was vulnerable to intrusion by vandals, the warrantless search was not unreasonable within the meaning of the Fourth Amendment. *Id.* at 448, 93 S.Ct. at 2531.

It is clear that, in *Cady,* the search for the defendant's service revolver was *"to protect the public* from the possibility that a revolver would fall into untrained or perhaps even malicious hands." *Id.* at 443, 93 S.Ct. at 2529. (Emphasis added.) As the Supreme Court later stated, the justification for the initial intrusion of the vehicle was the *"concern for the safety of the general public* who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447, 93 S.Ct. at 2531. (Emphasis added.) Hence, the Supreme Court repeatedly emphasized that the concern was for the general public, not an individual.

The "community-caretaking function" of police officers, in cases such as this, has its source in the ubiquity of the automobile and the dynamic, differing situations police officers are confronted with in which they must interact with the car and *driver* to promote *public* safety. *See U.S. v. Rodriguez–Morales,* 929 F.2d 780, 785 (1st Cir. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). (Emphases added.) The state acknowledges that previous Texas cases implicating the community-caretaking function involve situations in which a vehicle is stopped because of a police officer's concern for the

welfare of the *driver*. St. br. at 6.[3] The state argues that this distinction is misplaced. The majority holds similarly, finding that the *Cady* Court drew no distinction in the applicability of the community-caretaking function to stops to determine the welfare of passengers as opposed to that of drivers. *Ante*, at 152.However, the reason the Supreme Court drew no distinction is because that issue was not presented nor addressed in *Cady*, nor in any other Supreme Court decision since. *See Cady*, 413 U.S. 433, 93 S.Ct. 2523.

I find the distinction significant. Unlike a passenger, an unfit driver endangers not only himself, but the public at large. It is this endangerment of the general public that the *Cady* community-caretaking doctrine sought to curb. In the instant case, it is difficult to imagine how appellant, the passenger leaning out of the right rear passenger window throwing up, was a danger to the general public. Although appellant certainly may have been a danger to himself, he did not constitute a threat to the "safety of the general public." The officer's articulated reasons for stopping and detaining the car in which appellant was a passenger were that "[t]hey could have had a blowout, lost control. He could have been smashed into a pole or something like that. The car could have gone into a ditch, rolled over on top of him, broke his back." *Wright*, 959 S.W.2d at 357. Given that there was no evidence of reckless driving which was likely to produce the consequences projected by the officer, I agree with the court of appeals that these reasons were unreasonably speculative. *Id*. Even assuming, *arguendo*, that the reasons given by the deputy were legitimate, they refer only to the safety of appellant. There appears to have been no testimony that expresses concern for the *general public* which is the corner-

stone of the community-caretaking function promulgated in *Cady*.

I have found no Supreme Court cases citing the *Cady* community-caretaking doctrine on point with the facts of the instant case. Therefore, little guidance can be found there. There is guidance, however, from a case recently decided by the Idaho Supreme Court, where the defendant was a passenger in an automobile that was detained by police even though the officer observed no violation. *State v. Wixom*, 130 Idaho 752, 947 P.2d 1000 (1997).

In a single-car accident just before midnight, Wixom's car struck a mailbox and went through a fence into a field. *Id*. After a neighbor reported the accident, a responding officer observed the car in the field and determined that it was registered to Wixom's wife. *Id*. The officer also determined that the car was unoccupied, although he did notice beer, empty beer cans, and an odor of alcohol. *Id*. The officer found no sign of injury in or around the car. *Id*. As he was waiting for assistance to investigate the accident, the officer observed a pickup truck approaching. *Id*. He testified that he observed no traffic violations and that the vehicle was doing nothing suspicious, but may have been traveling more slowly than usual. *Id*. The deputy stopped the pickup, in which Wixom was a passenger, to ascertain whether the occupants had any information regarding the accident. *Id*. After questioning him, the deputy arrested Wixom for driving under the influence of alcohol. *Id*.

Wixom filed a motion to suppress the evidence obtained following the stop of the pickup, contending the stop violated his Fourth Amendment rights. *Id*. The state argued that the deputy's actions were reasonable as part of his community-caretaking function and the need to locate witnesses to the accident. *Id*. The district

**3.** Citing *Hulit v. State*, 982 S.W.2d 431; *Mc-Donald v. State*, 759 S.W.2d 784 (Tex.App.— Fort Worth 1988, no pet.); *Cunningham v. State*, 966 S.W.2d 811 (Tex.App.—Beaumont 1998); *Ortega v. State*, 974 S.W.2d 361 (Tex. App.—San Antonio 1998); and *Rheinlander v. State*, 888 S.W.2d 917 (Tex.App.—Austin 1994), pet. dism'd permanently abated, 918 S.W.2d 527 (Tex.Crim.App.1996).

court granted the motion to suppress. *Id.* On appeal, the state argued that the community-caretaking function applied because of the need to find the *possibly* injured occupants of the car. *Id.* at 1002. However, the Idaho Supreme Court agreed with the district court in rejecting the state's argument, finding that the deputy was merely seeking information about the accident and that he did not have a reasonable belief that the pickup occupants could assist him. *Id.*

The circumstances here are similar to *Wixom*. Appellant was not driving the car, the car was not being driven recklessly, nor were any traffic violations observed. *Wright*, 959 S.W.2d at 356, *Wixom*, 947 P.2d at 1001. Like the officer in *Wixom*, the officer in the instant case, according to his testimony, did not have a reasonable suspicion that the persons in the car in which appellant was riding were involved in criminal activity. *Wright*, 959 S.W.2d at 357, *Wixom*, 947 P.2d at 1002. There is nothing in his testimony to suggest that the well-being of the general public was at risk. Based on the foregoing, I agree with the court of appeals that detention of appellant was not lawful under the *Cady* community-caretaking function.

Beyond concluding that the community-caretaking function exists in Texas, the majority, although espousing narrow applicability, extends *Cady* in ways which appear to have no precedent. Without citation, the majority states that a police officer, as part of his duty to "serve and protect," may stop and assist an *individual* whom a reasonable person would believe is in need of help. *Ante*, at 152. First, this is an unwarranted extension of *Cady*. As noted above, *Cady* and its progeny focus on the concern for the *general public*, not the individual. Second, by allowing police officers to detain someone who, in their subjective opinion, is in need of assistance, the majority effectively removes constitutional guarantees which protect individuals from irresponsible or overbearing police intrusion. No longer does an officer need reasonable suspicion to detain a person, only that, in the officer's opinion, that person needs assistance. Finally, assuming, *arguendo*, that police officers may properly stop and assist an individual in need of help, I disagree with the majority that a "reasonable person" standard be used to determine whether assistance is needed. Consistent with other matters of law enforcement, the appropriate standard should be one of a "reasonable police officer." [4]

The majority, again without citation, announces four factors relevant to the determination of whether an individual needs assistance. *Ante*, at 152. These factors have not been presented in any previous case in which *Cady* has been applied.[5]

Although, under *Cady*, a community-caretaking function exists in Texas, remand is not appropriate, as the court of appeals expressly held that "appellant's detention would not have been lawful even

---

4. *See, e.g., Crittenden v. State,* 899 S.W.2d 668, 681 (Tex.Crim.App.1995) ("Under the modified objective standard, a *reasonable police officer*, without a traffic citation book ..."); *Brimage v. State,* 918 S.W.2d 466, 502 (Tex. Crim.App.1994) ("Taking into account all of the above information, a *reasonable police officer* could conclude that an emergency existed ..."); *Davis v. U.S.,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) ("Although a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clearly that a *reasonable police officer* in the circumstances would understand the statement to be a request for an attorney.") (internal citation omitted). (Emphases added.)

5. Assuming, *arguendo*, that the factors are apropos and complete, application of the factors to the instant case further supports the decision of the court of appeals. Appellant was merely vomiting, showing little distress; appellant was safely a passenger in a vehicle; two other people were with appellant in the vehicle, apparently able to assist him; and it was 4:00 a.m. with little traffic, presenting minimal danger to others.

under the *Cady* 'community caretaking' doctrine." *Wright,* 959 S.W.2d at 358. I would affirm the judgment of the court of appeals.

I respectfully dissent.